## BUSINESS FOUNDED ON WIFE'S CAPITAL HELD LIABLE FOR HUSBAND'S DEBTS.

Common Pleas Court of Cuyahoga County.

S. E. Strong, Trustee, v. W. H. Bueschner & Sons Co. et al.[*]

Decided, June 7, 1916.

*Husband and Wife—Business Started on Capital Furnished by Wife—But Managed With Great Skill and Success by Her Husband—Held to be Liable for His Debts.*

A business conducted in a field open to all, founded on money furnished by a wife without her interest therein being disclosed, and conducted by her husband as his own business though carried on in the name of the husband and sons, from the profits of which the husband supported a family of four after the manner of those in easy circumstances, the capital growing in seven years from $3,000 to $40,000 administered by a corporation, and from which original investment there accrued $70,000 during the seven years period, must be regarded as the result of the skill, genius, enterprise and good management of the husband, and may be subjected in equity to payment of his debts.

*Thos. H. Bushnell*, for plaintiff.
*Klein & Harris*, contra.

Foran, J.

This is an action by S. E. Strong, trustee, against the W. H. Bueschner & Sons Company, a corporation, Matilda Bueschner, the Euclid Music Company, Arthur H. Bueschner and Irving H. Bueschner, praying for the appointment of a receiver to take possession of certain assets and property and subject the same to the payment of the debts of one W. H. Bueschner.

The case was tried upon an agreed statement of facts and admissions of counsel during argument. The stipulation or agreed statement of facts, if not amplified by admissions, would

[*]Petition in error filed in the Court of Appeals, but dismissed by plaintiff in error without record and at his costs.

be worthless as evidence upon which to base a decree, and the petition is fatally defective so far as it seeks to subject certain real estate, therein described, to the payment of the debts of the said W. H. Bueschner, and is not satisfactory in other particulars.

The facts as gathered from the stipulations and admissions of counsel are substantially that, before 1904 one W. H. Bueschner was an improvident man, that is his counsel so admits, though the court has serious doubts about it; and that his wife, the defendant Matilda Bueschner, during the year 1904, acquired from her mother $3,000, which she put into a phonograph or victrola business in the city of Cleveland, and placed her husband, W. H. Bueschner, in charge thereof to run and manage for her.

It is admitted that at this time W. H. Bueschner had no property or assets of his own. The business in which he engaged with his wife's money was conducted under the name of W. H. Bueschner & Sons. All moneys belonging to this business and used in its operation were so deposited as to be wholly and solely controlled by the said W. H. Bueschner, and were checked out in his name. Arthur H. Bueschner and Irving H. Bueschner, defendants herein, aided and assisted their father, W. H. Bueschner, in conducting and carrying on said business; but just what part they had in the management of the business does not appear, as the stipulation merely says, "Her boys were in there too." This, as amplified by admissions, means that Arthur H. and Irving H. Bueschner are the sons of W. H. Bueschner and Matilda Bueschner; and that they were in the phonograph store or place of business, perhaps as salesmen or clerks.

No books of account were kept. Everything relating to the business and its management was controlled and directed by W. H. Bueschner. He had absolute charge of the business, and conducted and managed it as he deemed best. He paid all bills for goods and material used in the business, all household expenses, including his own personal expenses, from the proceeds or profits of this phonograph or victrola business.

On April 24, 1908, the husband, W. H. Bueschner, leased certain premises in Lakewood, Ohio, as a residence for himself and family, the family consisting of himself, his wife Matilda and the two sons referred to above. The lease was for the term of five years. In the stipulation is this statement: ''W. H. Bueschner paid the rent up to May 31, 1911, and refused to pay any more.''

Two suits were brought in the municipal court, and one suit in the court of common pleas, against W. H. Bueschner, for unpaid rent on the lease, and judgments were obtained for the entire term of the lease. The judgments aggregate, exclusive of costs, $1,734.41.

There is perhaps included in this an item of damages for waste or injury to the leased premises. It appears from the admissions of counsel, however, that the family vacated these premises May 31, 1911, for the reason that they were not habitable.

Only one of these actions was heard upon its merits, that is, contested. That was one of the suits brought in the municipal court. Whether this case tried upon its merits was tried to a jury, or whether taken to the court of common pleas on error, does not appear. Judgments for nearly three-fourths of the amount involved were obtained upon default, though personal service was had upon W. H. Bueschner.

If the premises were habitable, it is amazingly strange that they should have remained tenantless for two years in so popular a suburban residence district as Lakewood. Evidently no effort was made by the owner or landlord to secure a tenant; or if any reasonable effort was made, and a tenant could not be procured, it would seem to be conclusive that the premises were not habitable. The claim does not appeal to the court, and under no circumstances would any court resort to a forced or strained construction of legal principles to enforce it.

It is quite apparent that W. H. Bueschner honestly believed these claims for rent of premises during the period his family did not occupy them were unjust and conscienceless; and, thinking himself execution proof, he practically ignored them, and

thus negligently trifled with the rights of himself and family. The judgments, whatever their moral basis, are, however, legally subsisting judgments, and must be treated as though they were based upon actual family necessities.

Referring again to the agreed statement of facts, we find it stated that the phonograph business, begun in 1904 with the money that the wife acquired from her mother; ''grew and grew,'' and that the increment stayed right in the business, until, in December, 1910, it was incorporated as the W. H. Bueschner & Sons Company for $40,000, and this stock is to-day worth considerably more than par, or has a book value considerably in excess of $100 a share. Nor is this all, for in 1913 a branch, the Euclid Music Company, grew out of the parent stem, and this branch, organized or incorporated with a capital stock of $10,000, is today worth $25,000. Of the one hundred shares of the said capital stock of the Euclid Music Company, only twenty-seven were issued, and these to Matilda, the wife of W. H. Bueschner. Twenty of these shares she divided equally between her two sons, Arthur H. and Irving H. Bueschner. No money was paid for this stock, nor was any of the capital stock of the Euclid Music Company subscribed for paid in cash. A certain amount of goods and merchandise was transferred from the W. H. Bueschner & Sons Company to the Euclid Music Company, and the twenty-seven shares of stock issued to Matilda Bueschner in consideration of these goods or merchandise so transferred. The W. H. Bueschner Company was not paid for the goods or merchandise. Euclid avenue at 105th street has become an active business center of great growing possibilities. The parent company simply located a branch at this center, and placed the control thereof in the hands of Arthur H. and Irving H. Bueschner—and perhaps as a well-merited reward for services rendered the parent company. Legally, of course, this branch is a distinct and separate corporation. The sons also own forty-five shares of the stock of the W. H. Bueschner Company, though, so far as the stock certificate book indicates, the control of that company is nominally in Matilda Bueschner, the husband, W. H. Bueschner, as appears

by the books, holding only a voting share. Who the officers of the W. H. Bueschner Company are does not appear, the stipulations simply stating that after the incorporation "the business has been carried on as before. W. H. Bueschner was not paid any salary, nor did he have any salary." But he still draws all moneys to run the family and the business; that is, the corporation is run and managed by W. H. Bueschner precisely as he managed and conducted the co-partnership, if one existed between himself and sons.

It is claimed in the petition that a certain piece or parcel of real estate in Avon township, Lorain county, Ohio, appearing of record in the name of Matilda Bueschner, is in truth and in fact the property of W. H. Bueschner. There is not a scintilla of evidence in the agreed statement of facts or admissions of counsel, as the court now recalls, as to when or how this real estate was acquired, or how the title thereto was obtained, or who paid therefor; and it will therefore be wholly eliminated from any holding or finding herein made. For aught the court knows, it may have been purchased or owned by Matilda Bueschner before these transactions arose, or thereafter purchased with her own individual property or money.

In view of the statements of facts herein outlined, counsel for plaintiff claims that the issues involved, on the facts stated, fall squarely within the rule laid down in *Glidden* v. *Taylor,* 16 Ohio St., 509, where it is held in the syllabus:

"A husband, who had failed in a manufacturing business, commenced business anew with the money of his wife, with her consent, and carried on the business, professedly as her agent, for years, making large profits therefrom. A principal source of the profits was the personal services and skill of the husband. The wife gave no personal attention to the business. There was no contract between her and her husband as to his compensation; and no accounts were kept between the parties. Part of the proceeds of the business was applied to the support of the family, part used by the husband, and part invested in real and personal property in the name of the wife. In a suit by the creditors of the husband, to subject the property so purchased to the payment of his debts, *Held*:

"1.  The wife can not claim the whole of the property as profits arising from her separate money.

"2.  Where she thus suffers her money to be employed by the husband, and blended with his earnings, so that it can not be separated, the most favorable position she can be allowed to assume, is that of a preferred creditor in equity, and, as such, entitled to her money and interest."

We are reluctantly constrained to hold that the contention of counsel for plaintiff is sound.  We can see no escape from that conclusion.  Indeed, the facts in the case at bar present stronger reasons for so holding than do the facts in *Glidden* v. *Taylor*, where the rule just quoted is stated.  In *Glidden* v. *Taylor, supra*, the business was carried on in the wife's name, the husband acting as her agent or manager.  In the case before us the business was started in 1904 and was carried on by the husband in his own name, or perhaps in the name of W. H. Bueschner & Sons.  So far as the public knew, the business was the business of W. H. Bueschner; and if he was acting as agent, the principal was not disclosed.  The money obtained from the wife was in fact treated by W. H. Bueschner as a gift, treated as his own money, used as such in a way that left no doubt as to how he in fact regarded it; and this treatment of this fund by the husband was acquiesced in by the wife, so far as the record shows, at least from 1904 to December, 1910.  Counsel for defendants recognize the force of plaintiff's contention, but seek to avoid it by insisting that the doctrine of *Glidden* v. *Taylor, supra*, is no longer the law in this state, or in any other jurisdiction in the United States.  In this we can not agree with counsel.  *Glidden* v. *Taylor, supra*, has never been overruled or modified and is still the doctrine in Ohio, so far as the facts in that case are concerned.  We are told that the rule or principle applicable to the case at bar is correctly stated in *First Nat. Bank* v. *Rice*, 12 Circ. Dec., 121; 22 C. C., 183.  It is fundamental that in the application of precedents it must be remembered that every case is decided on its own facts; and no decision of an appellate or Supreme Court is to be regarded as precedent by a lower court, unless the doctrine therein announced can or

may be consistently applied to similar conditions and facts. It is not sufficient that the rule or doctrine announced purports to be or is claimed to be of general application. The doctrine in *Glidden* v. *Taylor, supra,* is based upon the facts of that case; and it will not be said that the doctrine in *First Nat. Bank* v. *Rice, supra,* is in conflict therewith unless it can be fairly said the doctrine announced in *Glidden* v. *Taylor, supra,* may be consistently applied to the facts and conditions in *First Nat. Bank* v. *Rice,* or, in other words, that the facts in the latter case are practically and substantially the same as in *Glidden* v. *Taylor.* The facts in the case of *First Nat. Bank* v. *Rice,* however, are in no way similar to the facts in the case at bar, or to the facts in *Glidden* v. *Taylor, supra.* In part 3 of the syllabus in *First Nat. Bank* v. *Rice, supra,* it is held:

"Although at a wife's request her husband attended to the management and control of a corporation in which she was interested, and by his skill and labor helped to produce valuable results, real estate purchased by her with money arising out of her share of the profits of the corporation can not, upon that ground, be subjected to the payment of her husband's debts."

With the proposition that profits accruing from capital stock actually and in good faith owned by a married woman, and acquired by her separate money or property, are not liable for her husband's debts, we are, within certain limits, in accord. At least we find no fault with the doctrine laid down in the case of *First Nat. Bank* v. *Rice, supra.* In that case the wife entered into partnership with her son and a third person. The husband had no connection with the partnership, or any interest therein, nor did he ever have any control or management thereof. When the business of the partnership was incorporated, the husband was given two shares of stock in order to qualify as a director. The wife, son and husband owned but one-half of the stock, the other half being owned by a stranger or person outside of the family. The entire stock was only $5,000. The company was manufacturing a patented article. In about eighteen months after the incorporation Mrs. Rice and

her son sold their stock to the other stockholder at a profit of
nearly $40,000. The skill or labor of the husband had but
little to do with the matter. The patent was undoubtedly the
real cause of the success of the venture. The husband's connec-
tion with the corporation lasted but about eighteen months. In
the case now before us, W. H. Bueschner, in 1904, received
$3,000 from his wife, which he treated as his own, and which
he was permitted by his wife to treat as his own property. By
his management, skill and labor, the profits from the $3,000
supported a family of four in a residence for which an annual
rental of $800 was being paid for at least a portion of the
time. This family was supported for six or seven years from
the proceeds of a business begun and established with $3,000.
Not only that, but the business so "grew and grew" that at the
end of these six or seven years it was incorporated for $40,000.
Admitting that W. H. Bueschner expended $5,000 a year on
himself and family, and this is a moderate estimate, it will be
seen that out of $3,000 there accrued in six or seven years the
enormous sum of $70,000. It will be sheer nonsense to say that
any considerable part of this sum was wholly due to the origi-
nal investment. That careful management, skill and business
acumen were largely responsible for this wonderful result must
in common fairness be admitted. When Matilda Bueschner
was issued two hundred shares of the stock of the incorporated
business, having an actual value largely or considerably in excess
of $20,000, can it in fairness or justice be said this was her
money? During the six or seven years preceding this issue, at
least $30,000 had been expended on her family of the increment
of the original $3,000. Surely the wonderful Ash of the Edda
or Jack's Beanstalk had no more phenomenal growth. Counsel
for plaintiff, like a good general, seeks to anticipate the thrust
at this weak spot in the armor of his defense by claiming that
this extraordinary increase was the result of the phenomenal
growth of the phonograph or talking machine business. But
then the most successful business, so far as growth and develop-
ment are concerned, has its limitations, and, unless monopolized
by patents, is open to all. In this field Briarean competition

is to be met as in all fields of business endeavor. Here as elsewhere there has been a common contest and striving for the same object. Trials of skill, tests of superiority, comparative fitness, are as noticeable here as in any business line. W. H. Bueschner may have been improvident in times past, but, judging by results, he is apparently a man of rare business genius and ability—that the personal equation has loomed large. Before the incorporation he used the name of W. H. Bueschner, and retained this name as the forefront of the corporate name.

In this case then, before we consider the question of managing a corporation in which a married woman holds stock, there is an antecedent question, or how did the married woman acquire the stock, and whose money paid for it? If the rule laid down in *Glidden* v. *Taylor, supra,* is the law in this state, there can be no escape from the conclusion that the stock issued to Matilda Bueschner was paid for with money earned by the skill, genius, enterprise and labor of her husband, W. H. Bueschner, and in equity the stock belongs mainly to him and may be subjected to the payment of his debts.

It is insisted that the facts in the case before the court bring it within the rule laid down in *Mayers* v. *Kaiser,* 21 L. R. A., 623, where it is said in the syllabus:

"A debtor may give his personal time, attention and services to the management and conduct of his wife's business for a series of years, without making the principal invested in or produced by such business or any part thereof, subject to his creditors, if the wife is actually the owner of the business.

"2. A debtor's time, talents and industry are at his own disposal, and his creditors have no claim thereto."

It will be noticed that the doctrine of this case is based upon the fact that "the wife is actually the owner of the business." This distinction should not be lost sight of. This is a Wisconsin case, and was an echo of the great Chicago fire. Kaiser, who lost practically all he had in that fire, began a small business in Wisconsin on money borrowed from his wife, for which he gave notes. The *bona fides* of the transaction between husband

and wife was clearly established.   The wife first employed the husband at $25 a week, and subsequently at $50 a week.   The claim was made that the business was in fact the business of the husband.   In *Mayers* v. *Kaiser, supra,* the court say:

"The evidence does not sustain, we think, the charge that what he (the husband) did was in pursuance of any plan or scheme to defraud his creditors."

That is, the court found the business was the wife's business, and that the money she loaned her husband, with which to begin it, was actually the wife's money, and that she employed her husband at a stated salary to run and manage it for her.   And the court further say:   "She might lawfully employ her husband, with or without hire, to manage it and assist her in carrying it on."

The proposition that a man may honestly devote his time and services gratuitously to another is unquestionably sound. In instances where this is done, that is, where the services are rendered gratuitously or practically so, the services are probably worth no more than is paid for them.  'Where, however, we find a ten-thousand-dollar man 100 per cent. efficient managing the business of his wife, and that business is moving forward with leaps and bounds, one would be apt to seriously doubt the claim that the services were being gratuitously rendered.

For this reason the court, in *Mayers* v. *Kaiser, supra,* say in the opinion:

"While the court should carefully scrutinize all cases of alleged fraud against creditors, wherein members of the family of a debtor make claim to important or valuable interests, yet judgment can not go upon mere suspicion."

The doctrine in this case if limited to its facts, is not in such sharp conflict with the Ohio doctrine as the syllabus would seem to indicate.   In this state we have legislation which seems to proceed upon the theory that husband and wife are, for all practical purposes, partners engaged in a joint enterprise, not

only of raising and maintaining a family, supporting themselves and making a home, but also in accumulating property. This legislation is found under title 6, Domestic Relations. These statutes, from Sections 7995 to 8002, G. C., inclusive, are in some respects declaratory of the common law, but they are in many respects in contravention thereof. By them it is enacted or provided that husband and wife contract toward each other obligations of mutual respect, fidelity and support; that the husband is the head of the family; that he must support himself, his wife and his minor children out of his property or by his labor, but if he is unable to do so, the wife must assist him so far as she is able. Neither husband nor wife has any interest in the property of the other, except that with respect to rights of dower; and the husband and wife may enter into and engage in transactions with each other the same as if unmarried; but they can not alter their legal relations, except that they may agree to an immediate separation and make provision for the support of either of them and their children during the separation; and, further, that either may take hold and dispose of property, real or personal, the same as if unmarried; and neither is answerable for the acts of the other.

To a large extent, the purpose of the Legislature in enacting this legislation was to do away with the common law rules with regard to interests and rights of husband and wife in the property of each other. *Hart* v. *Sarvis,* 3 Dec., 708; 3 N. P., 316. But before the passage of these statutes the wife had the right to hold property in her own name, and the husband had no interest therein except such as common law rules gave. The statutes just quoted, among other things, give to the wife the right to contract not only with her husband, but with any other person, respecting her real or personal property; and for that reason the contention of counsel, in their brief, that the rule laid down in *Glidden* v. *Taylor, supra,* has been modified or rendered nugatory by the passage of these acts, is not well taken. While it is true that jurists have always, and perhaps must of necessity, recognize the marriage contract as isolated in large measure from all other kinds of contracts, still it is a

civil contract, even though for the benefit of society and the family it is ordinarily treated as a legal status between the husband and wife. While, under the marriage contract, every resulting right growing out of the relation is absolutely fixed by the laws of the state, still the modern tendency is toward the approximation of that relation as that of two persons wholly and entirely equal before the law, each having indentically the same rights as to the acquisition and control of property. They may by express terms enter into partnership relations with each other, and divide profits in accordance with the terms agreed upon. The wife may furnish the capital, and the husband the skill, labor and experience, the same as other persons frequently do in partnership matters. And why may not a contract of this kind be inferred or implied from their conduct, acts and all the circumstances surrounding their transactions with each other? Suppose, for instance, Matilda Bueschner should be so unfortunate as to find it necessary to bring divorce proceedings against her husband; would she be permitted to say her husband had no interest in the business and property his genius, skill and labor created? Would any court hold he had devoted his services to her business gratuitously, or for his mere clothing, lodging and board? Or would a court say that his services, as a contribution to the partnership, were worth fully as much as her $3,000 contribution.

Taking this view of the situation, we have no difficulty in realizing that the contention of counsel for the defendants can not be seriously entertained.

In *Patton* v. *Smith*, 130 Ky., 819 (114 S. W. Rep., 315), the doctrine of *Glidden* v. *Taylor, supra,* is clearly endorsed, though that case was not referred to. It is claimed, however, that the note to this case shows that the doctrine of the case is not in harmony with the weight of authority. The case, however, was one where a farm owned by the wife was managed and conducted by the husband. Of course, the title to the farm being in the wife, the business carried on was necessarily the wife's business and was in her name, no matter how its management was conducted. While it is true that the cases cited in the note are

against the doctrine laid down, yet the editor says, "this note is expressly confined to cases where a married woman's property, or a business conducted in her name, is managed by her husband so that his labor and skill result in an increment thereof. Cases where a wife's money is used by her husband in a business carried on in his own name as well as where he uses his own money or property in the business of his wife, although carried on in her name, are excluded therefrom."

On that basis or in that view of the case, the preponderance of authority seems to be against *Patton* v. *Smith, supra.*

We think that a careful reading of all authorities relating to the question now before the court will clearly show that there is, after all, but very little divergence of opinion. In the case before us the husband carried on the business in his name, treated it as his business and managed it as his business, and his wife permitted him to do so; and it must be presumed that it either was his business, and that the money given him by his wife to start it was a donation or a gift, or that the business was carried on for the mutual benefit of both parties. And therefore there will be a decree for the plaintiff, by which a receiver may be appointed, and the assets of the two corporation defendants be subjected to the payment of the plaintiff's claim. The real estate mentioned in the petition is expressly excluded from the operation of this decree.